# JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| QUOC VIET FOODS, INC., | Case No.: SACV 12-02165-CJC(DFMx) |
| Plaintiff, | |
| v. | MEMORANDUM OF DECISION |
| VV FOODS, LLC, et al., | |
| Defendants. | |

## I.  INTRODUCTION & FACTUAL BACKGROUND

This is a trademark case involving soup base for pho, a Vietnamese noodle soup. The traditional preparation of pho is highly labor-intensive: a pho cook will begin by boiling beef bones for 30 minutes, discarding the water, washing the bones, and then

boiling them again to slowly extract the bone marrow and make a broth.  (Dkt. 270-2 at 12:21–13:10.)  Properly done, this process takes about a day.  (*Id*.)  Crucially, while the broth is cooking, the cook must scrape away detritus and scum that floats to the top of the pot.  (*Id*.)  Failing to do so will leave the broth cloudy instead of clear, as desired.  (*Id*.)  A pho cook needs to tend the pot for many hours, periodically scraping the top and slowly extracting the marrow.  (*Id*.)  Eventually meat and noodles are added to the broth to create the finished soup.

To simplify this process for consumers who do not have the time necessary to prepare pho, Tuan Nguyen—the president and CEO of Plaintiff and Counterclaim Defendant Quoc Viet Foods, Inc. (hereinafter, "Quoc Viet")—devised a soup base, sold in paste form, to which consumers could add water and quickly create pho broth without the intense traditional preparation process.  (*Id.* at 10:21–13:18.)  In 2002, Quoc Viet began selling its first two soup base products—one beef-flavored and one chicken-flavored.  (*Id.* at 14:8–15:6.)  The beef-flavored soup base was labeled Cốt Phở Bò, and the chicken-flavored soup base was labeled Cốt Phở Gà.  (*Id.*)

Only a few months after Quoc Viet began selling pho soup bases, Defendant and Counterclaimant VV Foods, LLC (hereinafter "VV Foods"), began producing and selling its own Vietnamese pho soup bases, also branded as Cốt Phở Bò and Cốt Phở Gà.  (Dkt. 270-7 at 28:7–29:7, 36:20–23.)  Since 2002, the parties have—in parallel—developed a number of other flavors of soup bases, including pork and vegetarian varieties.  Quoc Viet, believing that it owns trademark rights in the names of its soup bases, ultimately registered a number of trademarks with the United States Patent and Trademark Office ("PTO").  (Dkt. 270-2 at 23:5–6.)

//

//

In December 2012, Quoc Viet filed a complaint against VV Foods and two of its principals, Nga Vu and Thanh Vu,[1] alleging that they were infringing seven of its marks. (Dkt. 1; *see also* Dkt. 29 (First Amended Complaint).)  Those marks were:

1.  Cốt Phở Bò (beef-flavored pho soup base)
2.  Cốt Phở Gà (chicken-flavored pho soup base)
3.  Cốt Bún Bò Huế (beef-flavored vermicelli soup base)
4.  Cốt Súp Heo (pork-flavored soup base)
5.  Cốt Súp Chay (vegetarian soup base)
6.  Cốt Súp Gà (chicken-flavored soup base)
7.  Cốt Lẩu Thái Lan (Thai soup base)

(*See generally* Dkt. 29.)  This Order refers to these seven marks as the "Underlying Cốt Marks."

VV Foods counterclaimed for cancellation of the Underlying Cốt Marks, as well as nine other marks that Quoc Viet says it owns and that VV Foods says it may later use:

1.  Cốt Hủ Tiếu (pork noodle soup base)
2.  Cốt Canh Chua (tamarind soup base)
3.  Cốt Bún Riêu (vermicelli crab soup base)
4.  Cốt Súp Bò (beef soup base)
5.  Cốt Súp Hoành Thánh (wonton soup base)
6.  Cốt Súp Cà Ri (curry soup base)
7.  Cốt Phở Chay (vegetarian pho soup base)
8.  Cốt Sinh Tố (smoothie)

---

[1] For simplicity, the Court refers to Counterclaimants VV Foods, Nga Vu, and Thanh Vu collectively as "VV Foods" for the remainder of this Order.

9.  Cốt Bò Kho (beef stock base)

(*See generally* Dkt. 69.)  This Order refers to these nine marks as the "Additional Cốt Marks."  VV Foods currently does not sell any products bearing the Additional Cốt Marks.  (Dkt. 324-1 at 6.)

The parties proceeded to a jury trial on the question of VV Foods' alleged infringement of the Underlying Cốt Marks on March 8, 2016, (*see* Dkt. 215), and the jury began their deliberations on March 16, (Dkt. 253).  The chief issue at trial was the meaning of the word "Cốt."  Each of Quoc Viet's marks adheres to a pattern: the word "Cốt" followed by additional words describing the flavor or type of soup base at issue—and in one case, a smoothie.  The parties agreed that the non-"Cốt" words merely describe the product and flavor.  As Quoc Viet has explained,

> [A]ll of the marks that have been used in conjunction with Plaintiff's sale of its soup base products have one common characteristic; that is, the use of the Vietnamese word "CỐT."  The remaining words used in each of the marks specifically describes [sic] the particular soup products.  For example, with respect to the mark "CỐT PHỞ BÒ," the words "PHỞ BÒ" mean beef noodle soup, and with respect to the mark "CỐT PHỞ GÀ," the words "PHỞ GÀ" mean chicken noodle soup.  All other marks follow the same pattern.

(Dkt. 206 at 2.)  Only the meaning of the word "Cốt" was at issue, then, since Quoc Viet asserted that "Cốt" alone transformed what were otherwise ordinary descriptions of product flavors into protectable marks.  (Dkt. 260 at 177–82.)  VV Foods' position was that "Cốt" means "condensed," "concentrated," or "base," and that in the context of Quoc Viet's products, "Cốt" simply described a soup base.  (*Id.* at 195–97.)  Quoc Viet argued that "Cốt" has a number of meanings in Vietnamese, including "bones of the dead," and that it could not mean "condensed" without a modifier or "head word."  (*Id.* at 177–82.)  This issue was paramount because if "Cốt" simply *described* the products at issue, the

Underlying Cốt Marks were "descriptive" and needed to have acquired "secondary meaning" in order to be protectable.  (*See* Dkt. 284 at 4–9.)  By contrast, if "Cốt" did not straightforwardly describe the products at issue, the Underlying Cốt Marks may have been "suggestive" marks and therefore inherently protectable.  (*See id.*)

On March 18, 2016, the jury returned a verdict, finding that each of the seven trademarks was valid, protectable, and owned by Quoc Viet, that VV Foods—but not Nga Vu or Thanh Vu—infringed the trademarks, and that VV Foods' use did not constitute fair use.  (Dkt. 247.)  The jury deadlocked on the question of what damages Quoc Viet suffered, although it did agree that the statute of limitations barred Quoc Viet from collecting *any* damages it incurred prior to December 14, 2008.  (*Id.*)

VV Foods then moved for judgment as a matter of law, which the Court granted on June 14, 2016.  (Dkt. 284.)  The Court concluded that based on the evidence presented at trial, a reasonable jury could only have determined that the Underlying Cốt Marks were descriptive.  Quoc Viet's founder had initially told the PTO that "Cốt" meant "condensed or concentrated," Quoc Viet's language expert conceded twice at trial that in the context of food products, he would understand "Cốt" to mean "condensed," and Quoc Viet's registration activities impliedly admitted that the Underlying Cốt Marks were descriptive. (*See id.*)  No compelling evidence to the contrary emerged at trial, and the Court found that the Underlying Cốt Marks were descriptive.  (*Id.* at 15.)

The Court explained that since the marks were descriptive, Quoc Viet bore the burden of "proving by a preponderance of the evidence that the 'Cốt' marks had acquired secondary meaning before [VV Foods] began using the marks."  (*Id.*)  On the facts of this case, the Court explained, that essentially meant proving that the Cốt Marks had acquired secondary meaning during a very small window: between January 2002 at the very earliest, when Quoc Viet began using the Cốt Phở Bò and Cốt Phở Gà marks, and

October 2002 at the very latest, when VV Foods began using those same marks.  The Court found that Quoc Viet had wholly failed to demonstrate that any of the Underlying Cốt Marks acquired secondary meaning between January and October of 2002.  (*Id.*)

The Court did not consider the exact dates that Quoc Viet and VV Foods began using the rest of the Underlying Cốt Marks, since Quoc Viet did not show that the five later marks acquired secondary meaning regardless of whether Cốt Phở Bò and Cốt Phở Gà were protectable.  On the contrary, Quoc Viet's case, both at trial and in its post-trial briefing, adopted an all-or-nothing approach to the Underlying Cốt Marks' protectability.  For example, Quoc Viet did not often differentiate among the Underlying Cốt Marks with any regularity when examining witnesses.  (*See, e.g.*, Dkt. 275-4 at 55:14–15 ("Why did you choose to go with Quoc Viet's Cốt brand soup-base products?"); *id.* at 58:10–23 ("Are you familiar with the product—the soup-base product sold by Quoc Viet Foods? . . . [D]o you recall any time that you wanted to purchase Quoc Viet food products but later to be confused with another company's product?"); Dkt. 275-5 at 44:5–6 ("[D]o you associate the 'Cốt' mark to represent Quoc Viet Foods' brand of soup-based products?").)

Nor did Quoc Viet argue that only some of the Underlying Cốt Marks could have acquired secondary meaning.  It frequently treated the protectability of the individual Underlying Cốt Marks as rising and falling as a group.  (*See, e.g.*, Dkt. 275 at 7 ("Quoc Viet presented evidence that consumers associate Quoc Viet's trademarks and branding with Quoc Viet itself.").)  Other times, it simply adopted VV Foods' approach of focusing only on January through October of 2002.  (*See, e.g., id.* at 9 ("Quoc Viet presented evidence that it expended significant resources on advertising *before* VV Foods' products entered the marketplace [in 2002].");*id.* at 10 ("Quoc Viet conducted approximately 150 demonstrations . . . before VV Foods entered the marketplace.").)  Quoc Viet made no effort to demonstrate, either at trial or afterwards, how the five later Underlying Cốt Marks may have acquired secondary meaning if its original two marks—

Cốt Phở Bò and Cốt Phở Gà—had not.  Quoc Viet's opposition to VV Foods' motion for judgment as a matter of law only mentioned three of the Underlying Cốt Marks by name. (*See generally* Dkt. 275.)  There is little question that both parties conceptualized the Underlying Cốt Marks' protectability as turning on whether Quoc Viet could prove that Cốt Phở Bò and Cốt Phở Gà were protectable.  The Court concluded that VV Foods was entitled to judgment as a matter of law as to Quoc Viet's claims for infringement of all the Underlying Cốt Marks.  (Dkt. 284.)

Thereafter, VV Foods moved for partial summary judgment of all of its counterclaims—both for cancellation of the Underlying Cốt Marks and of the Additional Cốt Marks.  (Dkt. 288.)  The Court granted partial summary judgment as to the seven Underlying Cốt Marks (Cốt Phở Bò, Cốt Phở Gà, Cốt Bún Bò Huế, Cốt Súp Heo, Cốt Súp Chay, Cốt Súp Gà, and Cốt Lẩu Thái Lan), because it had already determined based on the evidence presented at trial that the marks were not valid, as they were merely descriptive and had not acquired secondary meaning prior to VV Foods' initial use.  (Dkt. 295.)  However, the Court concluded that the counterclaims concerning the Additional Cốt Marks must proceed to trial because those marks were not at issue in the first trial, so Quoc Viet had not yet had an opportunity to defend those marks' protectability— particularly with regard to secondary meaning.  (*Id.* at 8.)  The parties proceeded to bench trial concerning VV Foods' Counterclaims for cancellation of the Additional Cốt Marks and declaratory judgment regarding their invalidity on December 19, 2016.  (Dkt. 337.)

## II.  SUBJECT MATTER JURISDICTION AND STANDING

As an initial matter, Quoc Viet argues that the Court lacks subject matter jurisdiction over the remainder of this case because "Federal Courts do not have independent jurisdiction over cancellation actions" unless they are joined with an infringement claim.  (Dkt. 348 at 7–8 (citing *Airs Aromatics, LLC v. Opinion Victoria's*

*Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595 (9th Cir. 2014)).)  Quoc Viet first raised

this argument at a pre-trial conference held on December 12, 2016, and in a trial brief

filed the same day.  (Dkt. 326 at 3–4; *see also* Dkt. 328.)  The Court issued an order

directing VV Foods to show cause why the remaining counterclaims should not be

dismissed for lack of subject matter jurisdiction.  (Dkt. 328.)  VV Foods responded that

the Court did have subject matter jurisdiction over the remaining counterclaims because

VV Foods also sought declaratory relief.  (Dkt. 332.)  As Professor McCarthy's

authoritative treatise on trademark law explains, "if the declaratory plaintiff has in fact

been threatened with litigation for infringement of a federally registered mark, then it

should be allowed to bring an action for declaratory judgment to determine non-

infringement, and join with this claim a claim for invalidity of the registration, with a

prayer for cancellation of defendant's registration."  5 J. Thomas McCarthy, McCarthy

on Trademarks and Unfair Competition § 30:110 (4th ed. 2015).[2]  After receiving VV

Foods' briefing on the issue, the Court discharged the order on December 14, 2016,

finding that VV Foods' declaratory relief counterclaims for non-infringement and

invalidity conferred federal question jurisdiction.  (Dkt. 334; *see also* Dkt. 69 at 23–24

(Third Amended Counterclaim seeking, among other things, declaratory judgment of

invalidity and declaratory judgment of non-infringement).)

Quoc Viet argues that VV Foods "expressly abandoned" its counterclaim for

declaratory judgment of non-infringement prior to the bench trial.  (Dkt. 348 at 9.)  Quoc

Viet points out that on November 21, 2016, VV Foods filed a Memorandum of

Contentions of Law and Fact stating only that it was pursuing its counterclaims for

cancellation and for declaratory relief of *invalidity* at trial.  (*Id.* (citing Dkt. 316).)  It

notes that the counterclaim for declaratory relief of non-infringement was also omitted

_____

[2] Professor McCarthy's treatise is hereinafter cited simply as "McCarthy," with the appropriate volume
and section numbers.

from the parties' joint proposed final pretrial conference order.  (*Id.* (citing Dkts. 324 and 336 Ex. B).)  Whether or not VV Foods should have identified its counterclaim for declaratory relief concerning non-infringement in these pre-trial filings is not the relevant inquiry, however.  The critical inquiry in assessing the Court's subject matter jurisdiction is whether VV Foods identified this counterclaim in its pleadings, because the "presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  VV Foods' third amended counterclaims clearly raised the counterclaim for declaratory relief concerning non-infringement, and VV Foods did not dismiss this claim through formal amendment.  (Dkt. Dkt. 69 at 23–24.)  Thus, the Court has subject matter jurisdiction.  Quoc Viet does not provide, and the Court is unaware of, any authority stating that a party's failure to mention a claim in a memorandum of contentions of law and fact or in a joint proposed final pretrial conference order that was never adopted or approved of by the Court will strip the Court of subject matter jurisdiction.  *See* Wagstaffe, *Practice Guide: Federal Civil Procedure Before Trial (National Edition)* § 2:545 (The Rutter Group 2016) ("Plaintiff's abandonment of claims will affect the federal court's subject matter jurisdiction only if the 'abandonment' occurs through proper amendment procedures.") (citing *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1139–1140 (8th Cir. 2014) (Court retained jurisdiction despite plaintiff's statement in memorandum in opposition to summary judgment motion that he was dismissing federal claims)).

Quoc Viet also argues that there is no actual case or controversy between the parties sufficient to justify declaratory relief.  The Ninth Circuit has held that an "action for a declaratory judgment that a patent [or trademark] is invalid, or that the plaintiff is not infringing, [presents] a case or controversy if the plaintiff has a real and reasonable apprehension that he will be subject to liability if he continues to manufacture his

product." *Rhoades v. Avon Prod., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007) (modifications in original).  Quoc Viet is incorrect in asserting that it has "not undertaken any specific act directed at VV Foods with respect to the marks at issue." (Dkt. 348 at 12.)  As an initial matter, Quoc Viet had alleged that VV Foods infringed several of the Additional Cốt Marks in its original Complaint and in its First Amended Complaint. (Dkt. 1 ¶¶ 8–9; Dkt. 29 ¶¶ 18–19.)  More importantly, VV Foods presented evidence that Quoc Viet had threatened it with a trademark infringement lawsuit concerning Quoc Viet's Additional Cốt Marks, including an October 4, 2012, cease-and-desist letter from Quoc Viet to VV Foods asserting broad trademark rights to the "Cốt" term, as well as rights to three of the Additional Cốt Marks involved in the remaining counterclaims. (Dkt. 332-2.)  The letter threatened legal action if VV Foods did not "(1) Immediately agree to discontinue selling, offering for sale, advertising, promoting, or marketing mortgage and financial related services that contain the mark 'COT' alone or in combination with other words that are displayed in a way that are similar to the use by Quoc Viet; and (2) Immediately withdraw all marketing, advertising or promotional materials that display or show the mark 'COT' alone or in combination with other words or symbols." (*Id.*)  Quoc Viet has not changed its position. (Dkt. 347-2 at 22:19–23 ("The Court: . . . Are you taking the position that they can use the Cot Mark?" Mr. Buus: In the future?  The Court: Yes.  Mr. Buus: We may not; we may.  I don't know.").)  Thus, the Court finds that VV Foods still has a "real and reasonable apprehension that [it] will be subject to liability" in the future.[3]  *Rhoades*, 504 F.3d at 1157; *id.* at 1158 ("We conclude that DermaNew's FAC sufficiently alleged the requisite 'reasonable

---

[3] In its closing reply brief, Quoc Viet argues that there is no case or controversy between the parties because Quoc Viet would be barred under the doctrine of claim preclusion from suing VV Foods for infringement of the Additional Cốt Marks. (Dkt. 350 at 1.)  This argument fails because claim preclusion does not bar Quoc Viet from *ever* suing VV Foods again for trademark infringement.  For example, "[c]laims arising from acts of infringement occurring after those involved in the prior lawsuit could not have been asserted in that prior lawsuit and are not barred by claim preclusion.  The later occurring facts give rise to a new 'claim' even if they are a continuation of the same course of conduct." 6 McCarthy § 32:81.

apprehension' for purposes of Rule 12(b)(1).  Even though concrete threats are not required, under our circuit's 'flexible approach,' in order to demonstrate a reasonable apprehension of an infringement suit . . . DermaNew's FAC alleges three: 1) Avon's lawyer specifically threatened a trademark infringement suit at a meeting; 2) Avon's counsel wrote a letter threatening 'additional proceedings or litigation'; and 3) Avon's counsel told DermaNew's counsel that Avon would not give up its right to damages.").

Quoc Viet also points out that VV Foods is not currently using any of the nine Additional Cốt Marks, and argues that Nga Vu's testimony reveals that VV Foods has no concrete plans to do so in the future.  (Dkt. 348 at 12–13.)  Quoc Viet points out that Nga Vu testified that VV Foods does not currently sell Cốt Súp Bò, Cốt Súp Hoành Thánh, and Cốt Sinh Tố.  (Dkt. 348 at 12–13; Dkt. 347-2 at 63:16–19 ("Q: Do you sell the beef-flavored version of that soup base as well?" A: "We currently do not sell it.  But it's something we've thought about in the future."); id. at 67:15–18 ("Q: Do you have any plans on coming out with a wonton soup base similar to this one? A: Maybe not exactly. But if we do, we would call it the same thing."); id. at 69:21–23 ("Have you ever made this product or have plans to make this product? A: I have never used this product.").)[4] However, VV Foods does have plans to release products using some or all of the Additional Cốt Marks in the future—for example, VV Foods' website displays "upcoming and future products," which includes a Cốt Bò Kho product.  (Id. at 43:3–16; Trial Ex. 796.)  VV Foods has also made labels and brochures for a Cốt Canh Chua product that they had circulated at food shows in Vietnam.  (Dkt. 347-2 at 49:6–50:19; Trial Ex. 794.)  VV Foods' plans to expand its products are not more concrete due to threat of litigation from Quoc Viet.  Nga Vu testified that because Quoc Viet has also

---

[4] Quoc Viet also points out that when asked "Is it your plan to release this product in the near or distant future?" regarding Cốt Súp Heo, Nga Vu responded "We've always had plans to eventually push it out into the market later." (Dkt. 348 at 12; Dkt. 347 2 at 59:24–60:2.)  However, Cốt Súp Heo is not one of the Additional Cốt Marks presently at issue—it was one of the Underlying Cốt Marks and has already been cancelled, so this answer is irrelevant.

sued VV Foods' manufacturing company, the manufacturing company currently refuses
to produce any product for VV Foods displaying the term "Cốt."  (Dkt. 347-2 at 29:8–
30:9, 88:4–10.)  Quoc Viet has effectively barred VV Foods from taking more concrete
steps to use the nine Additional Cốt Marks with litigation and the threat of future
litigation, so it may not now block VV Foods' attempts to obtain legal certainty before
proceeding with its expansion plans.  The Court once again concludes that it has federal
question jurisdiction over VV Foods' declaratory relief counterclaims pursuant to the
Declaratory Judgment Act, 28 U.S.C. § 2201(a), and may accordingly exercise
jurisdiction over the cancellation counterclaims as well.

Finally, Quoc Viet argues that VV Foods, Nga Vu, and Thanh Vu do not have
standing to pursue this action because they do not have an objectively reasonable belief
that there is a likelihood of damage caused by the continuing registration of the mark.
(Dkt. 348 at 15.)  "The 1946 Lanham Act allows for cancellation of Principal Register
registrations, by one who 'believes that he is or will be damaged by the registration,' and
for cancellation of Supplemental Register registrations on the same ground."  3 McCarthy
§ 20:40.  "For a petitioner who alleges that the registered designation is descriptive or
generic, 'damage' is *presumed* if petitioner has a sufficient interest in using the
challenged designation in its business."  3 McCarthy § 20:50 (emphasis added).  Quoc
Viet's own cease-and-desist letter threatened VV Foods *and* its agents, (Dkt. 332-2 at 2),
and Quoc Viet prosecuted its case against all three Defendants during the March 2016
trial.  Quoc Viet's standing challenge is also unavailing in light of the aforementioned
evidence of Quoc Viet's threat of litigation and VV Foods' intent to expand the "Cốt"
marks.  As Professor McCarthy explains, "[i]f the owner of a registration has asserted it
against the Petitioner, either alleging infringement or asserting it in an *inter partes* case,
then [the P]etitioner is more than an 'intermeddler' and has standing to cancel that
registration."  3 McCarthy § 20:46.  VV Foods has met this threshold.

## III.  TRADEMARK CLAIMS

The nine Additional Cốt Marks are invalid because they are descriptive and have not acquired secondary meaning.  VV Foods is entitled to cancellation and declaratory judgment of invalidity concerning these marks.

### A.  Trademark Law

#### 1.  Distinctiveness

A trademark is a "word, name, symbol or device" that is used by a manufacturer or seller of goods or services to "identify and distinguish the seller's goods from goods made or sold by others." 1 McCarthy § 3:1.  Laws protecting trademarks have three primary goals: (1) protecting the public from being misled or confused about the nature and source of goods; (2) protecting the rights of a business to identify itself to the public and to protect its reputation in offering goods to the public; and (3) achieving the first two goals in a manner consistent with free and fair competition.  *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 618 (9th Cir. 1993).  To balance these sometimes-conflicting goals, trademark law protects only "distinctive" marks, or marks that are "used by a substantial number of people as a symbol to identify and distinguish one source." 2 McCarthy § 11:2.  Indeed, as Professor McCarthy explains, a word or symbol that is not distinctive is not a trademark at all.  *Id.* ("No distinctiveness—no mark.").

Trademarks are "often classified in categories of generally increasing distinctiveness; . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 768 (1992).  Fanciful, arbitrary, and suggestive marks "are deemed inherently distinctive and are entitled to protection." *Id.*  This is because they "naturally serve to identify a particular source of a

product." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). Generic marks, by contrast, "are not capable of receiving protection because they identify the product, rather than the product's source." *Id.* Descriptive marks fall in between: they are "not inherently distinctive," but may "acquire the distinctiveness which will allow them to be protected." *Two Pesos*, 505 U.S. at 769. This acquired distinctiveness is better known as "secondary meaning." *Id.*

Fanciful, arbitrary, and generic marks are usually easy to identify. Fanciful marks are "'coined words' that have been invented or selected for the sole purpose of functioning as a trademark," like "CLOROX," for bleach. 2 McCarthy § 11:5, 8. Arbitrary marks are words that are "in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality, or characteristic of those goods or services," like "OMEGA," for watches. *Id.* § 11:11, 13. Generic marks simply restate the identity of the product, like "CREAMED CORN" for, well, creamed corn. These three categories are usually easy enough to differentiate.

But, "[a]s with tonal shade variations in the colors of the visible spectrum of sunlight, the categories of the trademark spectrum often become difficult to distinguish at the boundaries." *Id.* § 11:2; *see also Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1197 (9th Cir. 2009) ("[L]egions of trademark lawyers can stay busy arguing about how marks in the middle, not so plainly descriptive, nor so plainly distinctive, should be categorized."). Particularly difficult is the boundary between descriptive and suggestive marks. As the Fourth Circuit has observed, "the line between descriptive and suggestive marks is scarcely 'pikestaff plain,' and the distinction to be given the two terms is frequently made on an intuitive basis rather than as a result of logical analysis susceptible of articulation." *Pizzeria Uno Corp. v. Temple*, 747 F.3d 1522, 1528 (4th Cir. 1984). The Ninth Circuit has similarly lamented that determining whether a mark is suggestive or descriptive is "far from an exact science" and "a tricky business at best." *Lahoti*, 586 F.3d at 1197; *see*

*also* 2 McCarthy § 11:66 ("The descriptive category almost imperceptibly shades over at its fringe into the suggestive domain.").  And properly determining whether a mark is suggestive or descriptive is particularly important because when a mark owner cannot show secondary meaning, protectability turns entirely on the owner's ability to establish that the mark is inherently distinctive.

"Various tests for determining the difference" between suggestive and descriptive marks have been used by courts.  2 McCarthy § 11:66.  The Ninth Circuit primarily applies what Professor McCarthy calls the "degree of imagination" test, which asks "how much imagination is required to get a description of the goods or services."  *Id.* § 11:67.  Under this test, the *Lahoti* court explained,

> the primary criterion for distinguishing between a suggestive and a descriptive mark is the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product.  A mark is suggestive if "imagination" or a "mental leap" is required in order to reach a conclusion as to the nature of the product being referenced.  By contrast, a mark is descriptive if it defines a particular characteristic of the product in a way that does not require any exercise of the imagination.

586 F.3d at 1198 (citations and some internal quotation marks removed).  Professor McCarthy concludes that "[if] the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness," and gives a number of examples of marks requiring, in his opinion, "some degree of imagination": "GLOW," for skin cream, "PENGUIN," for food freezers, and "SAMSON," for weight training machines.  2 McCarthy § 11:67.  By contrast, if a term "immediately conveys to one seeing or hearing it knowledge of the ingredients, qualities, or characteristics of the goods or services with which it is used," it is descriptive.  *Id.* § 11:19 (quoting *Application of Quik-Print Copy Shops, Inc.*, 616 F.2d 523, 525 (C.C.P.A. 1980)).  As Professor McCarthy points out, courts have determined

that "BREAK AND BAKE," for frozen cookie dough, "CAR-FRESHNER," for an automobile air deodorizer, and "TENDER VITTLES," for cat food, are descriptive. *Id.* § 11:24 (internal citations omitted).

Applying the degree of imagination test, courts in the Ninth Circuit have recently determined that:

- The mark "POM," for pomegranate juice, is suggestive, since "the word 'POM'— which is not ascribed independent pomegranate-related meaning by conventional dictionaries—requires customers to use some additional imagination and perception to decipher." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014).

- The mark "LIFEPROOF," used for a protective cell phone case, is descriptive, since "no mental leap" was required "for a purchaser of the product to conclude it will protect the electronic device from the exposures of life, such as water, dust, and scratches." *Seal Shield, LLC v. Otter Prods., LLC*, CASE NO. 13-cv-2736-CAB(NLS), 2014 WL 11350295, at *9 (S.D. Cal. Nov. 4, 2014).

- The mark "ECODIESEL," for diesel fuel, is descriptive, since a mental leap is not necessary to conclude that the mark refers to "a diesel fuel product that is more ecological than normal diesel fuel." *Unitek Solvent Servs. v. Chrysler Group LLC*, No. 12-00704, 2013 WL 5503087, at *7 (D. Hawaii Sept. 30, 2013).

Finally, a generic or descriptive word in a foreign language is not transformed into a suggestive, arbitrary, or fanciful mark just because it is used in the United States. Under the "doctrine of foreign equivalents," foreign words used in a mark are translated into English and *then* tested for distinctiveness. 2 McCarthy § 11:34. "The test is whether, to those American buyers familiar with the foreign language, the word would have a descriptive connotation." *Id.*

//

## 2. Secondary Meaning

Descriptive marks are only protectable upon a showing of secondary meaning. *Two Pesos*, 505 U.S. at 769. Secondary meaning is present when, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000). Importantly, secondary meaning is not called "secondary" because it is "second in importance" to some other factor, but because "[i]t is a new meaning added *second in time* to the original primary meaning of a designation," which "adds a new layer of meaning" to the original, descriptive meaning. 2 McCarthy § 15:1 (emphasis added). Secondary meaning takes time to develop, and it is "safe to say that no secondary meaning emerges full-blown at conception." *beef & brew, inc. v. Beef & Brew, Inc.*, 389 F. Supp. 179, 185 (D. Ore. 1974) (citation omitted). And, crucially, this secondary meaning must have been in existence "at the time and place that the junior user began its use of that designation." 2 McCarthy § 15:53; *see also Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 799 (9th Cir. 1970) (descriptive marks were not protectable "since there was no proof of secondary meaning prior to the . . . use . . . of defendant").

The inquiry into whether a particular mark has acquired secondary meaning is fact-intensive, and it is "impossible to lay down any generalized rule as to the minimum amount of distinctiveness necessary to achieve secondary meaning in a mark." 2 McCarthy § 15:28. Instead, each case should be taken on its facts. *Id.* "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Coach Leatherware Co., Inc. v. Ann Taylor, Inc.*, 933 F.2d 162, 169 (2d. Cir. 1991). It can be established in "many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity; manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of

intentional copying by the defendant." *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

### 3.  Trademark Registration and Cancellation

The Principal Register is the primary register of trademarks in the United States. "The Lanham Act provides that marks registered on the Principal Register 'shall be prima facie evidence' of the validity of the registered mark, of its registration, of the registrant's ownership, and of the registrant's exclusive right to use the mark on the goods or services specified in the registration." 6 McCarthy § 32:134; *see also CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 629 n.5 (9th Cir. 2007) (quoting 15 U.S.C. § 1057(b)). However, "this evidentiary effect 'shall not preclude an opposing party from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered.'"  6 McCarthy § 32:134.

"All marks capable of distinguishing applicant's goods or services and not registrable on the principal register" can be registered on the Supplemental Register.  15 U.S.C. § 1091(a).  The Supplemental Register, Professor McCarthy explains, "is a listing of non-mark designations (such as descriptive words) that are only 'capable' of someday becoming a 'mark' upon the acquisition of secondary meaning."  3 McCarthy § 19:33. "'[R]egistrations on the supplemental register shall not . . . receive [some of] the advantages' extended to marks registered on the principal register."  *CreAgri*, 474 F.3d at 629 n.6 (quoting 15 U.S.C. § 1094).  "In particular, unlike principal registration, supplemental registration is not 'prima facie evidence of the validity of the registered mark . . . of the registrant's ownership of the mark, [or] of the registrant's exclusive right to use the registered mark in commerce.'"  *Id.* (quoting 15 U.S.C. § 1057(b)).  "'In fact, it is not prima facie evidence of anything except that the registration issued.'"  3 McCarthy

§ 19:36 (quoting *In re Medical Disposables Co.*, 25 U.S.P.Q.2d 1801, 1805 (T.T.A.B. 1992)).

However, a registrant may subsequently apply to move its marks from the Supplemental Register to the Primary Register by filing an application under 15 U.S.C. § 1052(f) ("Section 2(f)") and arguing that its marks on the Supplemental Register have become distinctive through the acquisition of secondary meaning.[5]  Under Section 2(f), the PTO may accept "proof of substantially exclusive and continuous use" of a mark by the registrant for five years as "prima facie evidence that the mark has become distinctive."  "The presumption to which a § 2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning as of the date of registration."  2 McCarthy § 15:34.  "The Federal Circuit has said that when a petitioner seeks to cancel a registration that was made under Lanham Act § 2(f), 15 U.S.C.A § 1052(f), the descriptiveness of the mark is not in issue because 'an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive.'  In such a case, the only issue is whether the petitioner can rebut the presumption that the USPTO was correct in accepting the evidence as proof of acquired distinctiveness (secondary meaning)."  *Id.* (quoting *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1358 (Fed. Cir. 2009)).

"Cancellation of the registration is appropriate if it is established either that as of the time of registration, the registered term was merely descriptive and lacked secondary meaning or that as of the time of the decision in the cancellation proceeding the mark is merely descriptive and lacks secondary meaning.  Even if at the time of the cancellation proceeding the term has secondary meaning, the registration will be cancelled if it is

---

[5]  A registrant may also file an application under Section 2(f) for marks that never appeared on the Supplemental Register.

proven that at the time of the registration, the term was descriptive and was devoid of secondary meaning."[6]  3 McCarthy § 20:54.

The party seeking cancellation of a trademark bears the initial burden of establishing a prima facie case that the registration is invalid by a preponderance of the evidence.  *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1358 (Fed. Cir. 2009); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023 (Fed. Cir. 1989); 3 McCarthy § 20:64 ("The burden of proof on the party in the position of plaintiff is the same in both Oppositions and Petitions to Cancel: a preponderance of the evidence".)  "To satisfy this initial burden, the party seeking cancellation must 'present sufficient evidence or argument on which the board could reasonably conclude' that the party has overcome the record evidence of acquired distinctiveness—which includes everything submitted by the applicant during prosecution.  The burden of producing additional evidence or argument in defense of registration only shifts to the registrant if and when the party seeking cancellation establishes a prima facie showing of invalidity."  *Cold War Museum, Inc.*, 586 F.3d at 1358.

## B.  The Additional Cốt Marks Are Descriptive

The nine Additional Cốt Marks at issue in this case have differing registration statuses, which affects the evidentiary presumptions available for each mark.  Five are registered on the Principal Register.  Four of those five—Cốt Hủ Tiếu, Cốt Canh Chua,

---

[6] Cancellation on this ground is only available if the petition for cancellation was *brought* less than five years from the date of registration.  *Imperial Tobacco Ltd., Assignee of Imperial Grp. PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1578–79 (Fed. Cir. 1990); *Consorzio Del Prosciutto Di Parma*, 23 U.S.P.Q.2d 1894 (T.T.A.B. June 17, 1992); *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 761 (C.C.P.A. 1982).  Although three of the Additional Cốt Marks have been on the Principal Register since 2011, they can still be challenged because this lawsuit was initiated before they had been on the Principal Register for five years.  (Trial Ex. 830.)

-20-

Cốt Bún Riêu, and Cốt Súp Bò—were registered pursuant to Section 2(f) application—
the first three in October 2011 and the fourth in February 2014.  (Trial Exs. 809, 830.)
The fifth, Cốt Phở Chay, was registered on the Principal Register in May 2014.  (*id.*)
Three more—Cốt Súp Hoành Thánh, Cốt Súp Cà Ri, and Cốt Sinh Tố—are registered on
the Supplemental Register, and the last mark—Cốt Bò Kho—has a pending application
for registration on the Supplemental Register.  (*Id.*)

The marks on the Supplemental Register are not entitled to any evidentiary
presumptions.  3 McCarthy § 19:36.  Only Cốt Phở Chay enjoys an initial presumption of
validity regarding descriptiveness—the remaining four marks on the Principal Register
were obtained via Section 2(f) applications, so they only enjoy a presumption of validity
regarding secondary meaning.  2 McCarthy § 15:34 ("The presumption to which a § 2(f)
registration is entitled is not that the designation is inherently distinctive, but that it had
acquired secondary meaning as of the date of registration.").  In any event, the evidence
presented at trial concerning the Additional Cốt Marks demonstrates that all nine—
including Cốt Phở Chay—are descriptive.[7]  Although Quoc Viet did not register a
trademark for the word "Cốt" by itself, the evidence concerning the nine Additional Cốt
Marks presented by both sides presumes that "Cốt" is used exactly the same way in all
nine marks because they all concern food products (soup base or smoothie base).  There
is no evidence suggesting that some of marks were descriptive and some were not, and
that is not how either side presented its case.

---

[7] Marks that have been on the Principal Register for at least five years may become "incontestable" so
long as "there is no proceeding involving said rights pending in the United States Patent and Trademark
Office or in a court and not finally disposed of."  15 U.S.C. § 1065.  None of the marks on the Principal
Register are incontestable because they had not been on the Principal Register for five years prior to the
initiation of this lawsuit.  (Trial Ex. 830.)

### 1.  Language Testimony

The registrations of the nine Additional Cốt Marks state that "Cốt" means "essence." (Trial Ex. 809.)  However, VV Foods' language expert, Tyler Nguyen, testified that although "Cốt" has many different meanings, including "essence," this translation is "completely inappropriate" in context of food products.  (Dkt. 347-4 at 11:6–11, 12:12–18.)  Here, in each of the Additional Cốt Marks, the words that follow "Cốt" simply described the contents of the food product inside the packaging, so the only reasonable context is that of food products.  (*Id.* at 17:15–18:12, 19:7–11, 22:1–10, 23:12–24, 24:4–15, 25:10–26:11, 26:12–27:10, 27:16–28:9, 28:10–29:17.)  Tyler Nguyen stated that for "soup-base products or food products in general," "essence" is not a clear definition.  (*Id.* at 12:24–13:1.)  Instead, he explained that "we have a much clearer definition of the term 'Cot' that can be used perfectly to describe food products, and its 'extract.'  Or you can go with 'condensed,' 'concentrate,' or even 'base,' because they're along the lines of 'extract.'"  (*Id.* at 13:1–5.)  Other meanings of "Cốt" include "pure," or "original," but he explained that these are not proper in the context of food products because there are other meanings that correspond directly to food products.[8]  (*Id.* at 13:15–24.)  For this same reason, although "Cốt" can also mean a human "bone," in this context Tyler Nguyen found that meaning to be "absurd and unreasonable."  (*Id.* at 13:7–14.)  In Tyler Nguyen's expert opinion, as used each of the Additional Cốt Marks, "Cốt" does not convey the meaning of "essence" to purchasers of Quoc Viet's products—it conveys a meaning of "extract," "condensed," "concentrate," or "base."  (*Id.* at 17:15–

---

[8] Quoc Viet points out that Tyler Nguyen said other translations of "Cốt" were "ambiguous," and argues that marks cannot be descriptive when the general public considers the meaning of the mark to be ambiguous.  (Dkt. 350 at 11.)  However, Tyler Nguyen's testimony demonstrates that in using the word "ambiguous" he meant "I don't think it's appropriate *in this context*" because there is another translation that is perfectly suited in the context of food products.  (Dkt. 347-4 at 11:24–12:2, 13:20–24.)  Tyler Nguyen did not testify that Quoc Viet's use of "Cốt" was ambiguous such that the general public would not know which translation of the word is most appropriate.  (*See id.*)

18:12, 19:7–11, 22:1–10, 23:12–24, 24:4–15, 25:10–26:11, 26:12–27:10, 27:16–28:9, 28:10–29:17.)

Quoc Viet's language expert, Dung Ngoc Tran, disagreed, testifying that the Additional Cốt Marks use "Cốt" in a manner that is linguistically and culturally unusual, because without a "head word," it cannot refer to food.  (Dkt. 347-5 at 65:13–20 ("[I]t doesn't have anything to do with soup base or whatever.  It means bone, core, pure, or concentrate.  In this content [sic] it is not concentrate.  It is not pure.  It is not core.  It is not bone.").)  However, he did testify that the meaning of "Cốt" depends on the context in which it is used, (*id.* at 62:22–63:1), and clearly agreed that the Additional Cốt Marks concerned food products, (*see, e.g.*, *id.* at 64:20–65:2).  At the previous trial, he admitted twice that "one of the meanings of the word Cốt is condensed or concentrated."  (Dkt. 270-6 at 75:4–13.)  He also previously testified that if he were to see the word "Cốt" in the context of food labeling, he would "think that [it meant] condensed."  (*Id.* at 75:25–76:5; Dkt. 347-5 at 71:18–72:23.)

Quoc Viet's president, Tuan Nguyen, testified that "condensed" or "concentrated" does not describe Quoc Viet's products because they are made by mixing, not by cooking or otherwise taking a high volume product and turning it into a low volume product. (Dkt. 347-4 at 60:2–4, 67:19–68:11.)  He described his products as being more akin to a bouillon cube than Campbell's condensed soup.  (*Id.* at 60:5–14.)  However, Quoc Viet's own promotional materials state that its "chicken soup base is made from concentrated chicken broth."  (Trial Ex. 508.)  Tuan Nguyen even admitted that the products are cooked to extract flavor (for example, from a bone)—the manufacturer cooks the product before turning it over to Quoc Viet.  (Dkt. 347-5 at 54:16–55:7.)  In any event, Tuan Nguyen agreed that to use his products, "a consumer would take some of the solid base and reconstitute it in water to make the desired soup."  (*Id.* at 67:7–10.)  This is consistent with the meaning of "Cốt" as "condensed," "concentrated," "extract," or "base"—these

words similarly tell consumers that they would have to add water to get the desired soup. Tuan Nguyen conceded that "Cốt" is not used on the labels of Quoc Viet products that do *not* need to be reconstituted with water—such as pickled radishes.  (Dkt. 55:16–56:1.) That "Cốt" is only used on the products that need to be reconstituted with water indicates that "Cốt" is meant to alert consumers to the fact that their product is a condensed, concentrated, extracted, or base product, corroborating the testimony of VV Foods' language expert.

As VV Foods points out, the "evolution" of Quoc Viet products also demonstrates that the use of "Cốt" is descriptive.  When Quoc Viet decided to change a particular beef-flavored seasoning (Gia Vị Bò Kho) to a soup base product (Cốt Bò Kho, one of the Additional Cốt Marks at issue here), the company changed the corresponding English translations on the labels from "Beef Stew *Seasoning*" to "Beef-flavored *Stew Base*." (Dkt. 347-4 at 103:1–104:4.)  Quoc Viet's president, Tuan Nguyen, testified that in that context, "Gia Vị" was used as a generic term to mean "seasoning."  (*Id.* at 103:3–5.)  The logical inference, then, is that when Quoc Viet changed the Vietnamese portion of the label from "Gia Vị" to "Cốt" and changed the English words on the label from "seasoning" to "stew base," it was using these words descriptively to tell consumers what was inside the container.

Additionally, neither side produced any meaningful evidence that consumers would be required to exercise "imagination" or "multi-stage reasoning" to understand the meaning of "Cốt" in the context of food labeling.  At the previous trial, Dung Tran did testify that he believed Quoc Viet might be using "Cốt" as a pun because it can mean "bones of the dead."  (Dkt. 270-6 at 72:2–9.)  But even accepting Dung Tran's theory that one meaning of "Cốt" might have been perceived by customers as silly when attached to food products, the marks are still descriptive, since another meaning of "Cốt" clearly describes the products without the need for multi-stage reasoning.  As this Court

previously explained, "[i]f a company sells blue-colored umbrellas under the 'Blue Umbrellas' mark, the mark is not suggestive merely because 'blue' can also mean 'melancholy' or 'obscene.'  What matters is whether any meaning of a mark describes the product or not.  It requires no imagination or mental leap to apply the right definition of a term, among several."  (Dkt. 284 at 11.)  Here the language experts' testimony concerning the Additional Cốt Marks only supports one conclusion: "Cốt" describes the contents of Quoc Viet's products.

## 2.  PTO Proceedings

Quoc Viet's prior trademark prosecution before the PTO also supports the finding that the "Cốt" marks are descriptive.  Perhaps most significant in this regard is the PTO's initial opinion that the "Cốt" marks lacked inherent distinctiveness.  "Given [the difficulty] in determining whether a mark is descriptive or suggestive, courts have often given due regard to the determination of the Patent and Trademark Office, which necessarily decides whether a mark is descriptive or suggestive in its decision whether to register the mark." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 934 (4th Cir. 1995); *see also Lahoti*, 586 F.3d at 1199 ("Deference to the PTO's classification decision is sensible because the PTO has special expertise that [courts] lack on [the] fact-intensive issue [of whether a mark is descriptive or suggestive].")  Quoc Viet first attempted to register some of its Underlying Cốt Marks with the PTO in 2003.  As part of the initial application, Tuan Nguyen sent the PTO an email on behalf of Quoc Viet explaining that "Cốt" meant "condensed or concentrated." (Dkt. 347-3 at 124:12–25; Trial Ex. 507.)  The PTO subsequently rejected registration of the "Cốt" marks on the ground that they were "merely descriptive of the identified goods." (Dkt. 270-3 at 42:22–43:10.)  Quoc Viet responded to the PTO's rejection of its marks by choosing to place them on the PTO's Supplemental Register.

With regard to the Additional Cốt Marks, the translation of "essence" was first used in connection with the prosecution of the Cốt Hủ Tiếu application.  (Trial Ex. 798; Dkt. 347-3 at 81:15–82:14.)  Since Quoc Viet submitted that registration without a translation, the PTO examiner used an online dictionary and suggested the translation "essence," which Quoc Viet accepted.  (*Id.*)  Cốt Hủ Tiếu was then placed on the Supplemental Register.

As explained earlier, Quoc Viet placed seven of the Additional Cốt Marks on the Supplemental Register and ultimately moved four of those marks (Cốt Canh Chua, Cốt Bún Riêu, Cốt Hủ Tiếu, and Cốt Súp Bò) to the Principal Register through Section 2(f) applications after five years of use.  (Trial Ex. 830; Dkt. 324-1 at 5–6.)  Three marks remain on the Supplemental Register (Cốt Súp Cà Ri, Cốt Súp Hoành Thánh, and Cốt Sinh Tố).  (*Id.*)  "An application for registration on the Supplemental Register is an implied admission that [a] term is not inherently distinctive," 3 McCarthy § 19:43, although a future factfinder is "not bound by the applicant's conclusions" on that question, *In re Hester Indus., Inc.*, 230 U.S.P.Q. 797, at *1 (T.T.A.B. 1986).  Similarly, the decision to seek registration on the Principal Register via a Section 2(f) application is "tantamount to a concession of a mark's non-distinctiveness."  *Gen. Foods Corp. v. Mgd Partners*, 224 U.S.P.Q. 479, at *6 (T.T.A.B. Sept. 28, 1984); *accord Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994) (holding that "[t]he submission of evidence under Section 2(f) . . . amounts to a concession that the mark sought to be registered is not inherently distinctive," and that marks so registered "cannot be inherently distinctive as a matter of law").  Evidence of the PTO's determination of non-distinctiveness, Tuan Nguyen's email to the PTO that defined "Cốt" as "condensed or concentrated," and Quoc Viet's subsequent election to place its marks on the

Supplemental Register, further support the Court's conclusion: the Additional Cốt Marks are descriptive.[9]

## C.  The Nine Additional Cốt Marks Did Not Acquire Secondary Meaning

Since the nine Additional Cốt Marks are descriptive, they are only protectable if they acquired secondary meaning at the time of registration.  For the four marks registered pursuant to a Section 2(f) application, the "only issue is whether the petitioner can rebut the presumption that the USPTO was correct in accepting the evidence as proof of acquired distinctiveness (secondary meaning)." 2 McCarthy § 15:34 (quoting *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1358 (Fed. Cir. 2009)). In the instant action, Quoc Viet submitted only a declaration of five-years use during the prosecution of the Cốt Marks that were registered pursuant to Section 2(f).  (Dkt. 347-3 at 97:6–12.)  The evidence presented at trial demonstrates that the Additional Cốt Marks never acquired secondary meaning, so the PTO incorrectly accepted Quoc Viet's evidence as proof of secondary meaning.  All nine Additional Cốt Marks are accordingly invalid and must be cancelled.

### 1.  Supermarket Practices

At trial, VV Foods presented evidence demonstrating that Vietnamese supermarkets label their shelves and aisles that contain soup base products with the term "Cốt."  Jayce Yenson, the owner of Saigon City Marketplace, testified that on his store shelves containing Quoc Viet's soup base products, he writes "Quoc Viet" before the description of each "Cốt" product in order to distinguish various soup base products for

---

[9] VV Foods characterizes the Additional Cốt Marks as not only descriptive, but "highly descriptive." (Dkt. 347 at 5–8.)  It argues that "highly descriptive marks" have stricter requirements for registration. (*Id.* at 8–9.)  The Court need not consider this argument, however, because as discussed below, the evidence demonstrates that the marks did *not* acquire secondary meaning.

his customers.  (Dkt. 347-3 at 11:8–24 ("When we label the products, we go with the— either the manufacturer or the brand.  Then the next part is—will be a description of the products.  So the Quoc Viet would be the brand, and the Cốt Phở Chay is the name of the product.").)  He explained that he writes "Quoc Viet" before the word "Cốt" "because there are other company [sic] out there that make the product very same."  (*Id.* at 11:17–24.)  Another store, ABC Supermarket, has the same practice.  (Trial Ex. 542.)  Unlike ABC Supermarket, however, Saigon City Marketplace does not include an English translation on the store shelf label because it finds the Vietnamese text such as "Cốt Phở Chay" provides sufficient information to the customer about the product.  (Dkt. 347-3 at 23:2–13.)

Quoc Viet presented evidence that another manufacturer of Vietnamese soup base products, Ton & Company, labels its soup bases as "Nguyên Chất" instead of "Cốt," in an attempt to show that "Cốt" is not necessary to describe a soup base product.  (Trial Ex. 230.)  In response, VV Foods presented rebuttal evidence demonstrating that the supermarket that sold Ton & Company's soup bases (A Dong Supermarket) placed such products under a *store* label that read "T&C Pho Broth Concentrate (All Flavor) Cốt Phở (Ton & Company Food)."  (Trial Ex. 834; Dkt. 347-5 at 81:24–82:12.)  VV Foods demonstrated that another Asian supermarket, Saigon Supermarket, also placed Ton & Company soup base products on shelves entitled "T&C GV Cot Pho Ga."  (Trial Ex. 835; Dkt. 347-5 at 85:13–86:2.)  This is strong evidence that no secondary meaning is attached to the Additional Cốt Marks to tie them to Quoc Viet in particular, because Ton & Company does not use the term "Cốt" on its labels and supermarkets nevertheless placed Ton & Company products under store signs or shelves with the word "Cốt."  Saigon supermarket even placed VV Foods' soup base products directly below Ton & Company's in that same aisle, even though VV Foods' own products also do not currently use the word "Cốt" on their labels due to the present litigation.  (Trial Ex. 835; Dkt. 347-5 at 87:4–13; 88:13–89:3.)  VV Foods' evidence demonstrates that "Cốt" has

*not* acquired secondary meaning because Asian supermarkets use it to describe a particular type of product and do not associate it with Quoc Viet in particular.  *See* 2 McCarthy § 11:25 ("Proof that others are using a term in a descriptive sense on the same or closely related goods, is evidence tending to rebut alleged secondary meaning in a descriptive term.").

## 2.  Consumer Usage

Quoc Viet did not conduct a trademark survey for any of the marks at issue.  (Dkt. 347-5 at 25:6–15.)  VV Foods did commission a trademark survey expert, Kristina Sing, to conduct a genericness survey (using the "Teflon" format[10]) of over 100 individual consumers at Saigon City Marketplace in December 2013.  (Dkt. 347-3 at 36:4–12, 38:9–11, 40:15–19.)  The survey focused on three of the Underlying Cốt marks that had been on the market the longest—for over ten years.  (*Id.* at 37:6–38:1.)  The results of her survey showed that approximately 85% of customers surveyed perceived the chosen "Cốt" marks to be common names, and only 11% perceived them to be brand names.  (*Id.* at 51:16–23.)  She concluded that "[t]he alleged trademarks belonging to Quoc Viet Foods, Inc., are not recognized as brand names in the context of food and food products. They are strongly perceived to be common names."  (*Id.* at 52:12–15.)  At trial, she opined that her results were representative of both the Underlying Cốt Marks and the Additional Cốt Marks.  (Dkt. 347-3 at 50:18–51:8, 51:16–23.)  She explained that because her survey results showed that the three products which had been on the market for approximately ten years had not gained brand recognition, the newer Additional Cốt Marks could not have obtained brand-name recognition either.  (*Id.* at 51:2–8.)

---

[10] In "Teflon" surveys, respondents are given "a mini-course in the generic versus trademark distinction" and then asked to apply their understanding to a set of terms. 2 McCarthy § 12:16.  "The *Teflon* format is the most judicially accepted format for testing for genericness" and is widely used in trademark cases. *Id.*

Quoc Viet points out that Kristina Sing conceded that the survey was designed to test genericness, not secondary meaning.  (Dkt. 350 at 7 (citing Dkt. 348-5 at 53:5–54:12).)  However, a "*Teflon* test is generally an accepted format to measure secondary meaning."  *Schwan's IP, LLC v. Kraft Pizza Co.*, 379 F. Supp. 2d 1016, 1024 (D. Minn. 2005); *see also Community State Bank, N.A. v. Community State Bank*, 758 N.W.2d 520, 526 n.2 (Iowa 2008) ("The 'Teflon Survey' is often used in trademark cases to establish secondary meaning where the disputed mark is comprised of common descriptive terms."); *March Madness Athletic Ass'n, LLC v. Netfire, Inc.*, 310 F. Supp. 2d 786, 809–810 (N.D. Tex. 2003) (Relying on evidence that a majority of respondents in a "Teflon" survey thought that "march madness" was a mark and not a generic name to show the existence of secondary meaning.).  Here, the study was "designed to prove or disprove whether or not consumers felt that the alleged trademarks had reached a level of designation as a brand name versus a common or generic name."  (Dkt. 347-3 at 28:16–19.)  That the majority of consumers thought it was a common name, and therefore not associated with Quoc Viet in particular, is evidence that the marks had not acquired secondary meaning at the time the survey was taken.

Quoc Viet also criticizes the survey as "abysmal and unreliable" on the grounds that it was biased in favor of genericness, conducted at a biased location, and that Kristina Sing "cut corners" by limiting the survey to one location and one day.  (Dkt. 350 at 15.)  Quoc Viet provides no meaningful support for its claims of bias, and these criticisms were all addressed at trial.  Although Kristina Sing did conduct the survey at just one supermarket in part because of budgetary concerns, she chose an Asian supermarket (as opposed to a "local Costco or local Albertsons") because there she would find a greater sample of consumers shopping for Vietnamese food products.  (Dkt. 347-3 at 41:22–42:11.)  She also testified that the sample size was adequate because the survey was done completely at random and the results were significant at a 95% confidence level.  (*Id.* at 45:17–46: 8.)  With regard to store bias, she explained that "it would be

extremely difficult for an one person to be able to influence a survey of this type,
particularly since it was completely confidential and no one outside of myself and the
legal team had no idea as to the actual methodology, the questionnaire design or what we
were intending in terms of the purpose of the survey." (*Id.* at 43:23–44:3.)  Quoc Viet
could have commissioned its own survey in an attempt to show that Kristina Sing's
results were unrepresentative, but it decided not to on the grounds that it was
"unnecessary."  (Dkt. 350 at 18.)

Instead, Quoc Viet relies heavily on the prior testimony of representatives of its
business customers from the earlier trial concerning the Underlying Cốt Marks to
demonstrate that "Cốt" has acquired secondary meaning through customer usage.  (Dkt.
348 at 31–32.)  None of these witnesses were called for the trial concerning the
Additional Cốt Marks.  To begin with, Quoc Viet points out that Stuart Rushbrook, the
operator of a cafeteria, testified that he sent an employee to purchase Quoc Viet's Cốt Hủ
Tiếu but the employee was confused and instead purchased a VV Foods product.  (Dkt.
348 at 32 (citing Dkt. 348-12 at 53:22–55:20).)  Rushbrook had also signed a trite and
boilerplate declaration in Quoc Viet's favor.  (Trial Ex. 688 ("We are aware that Quoc
Viet Foods, Inc. ('Quoc Viet') identifies their Vietnamese soup base products with the
term 'Cốt' and we recognize the 'Cốt' branded soup base products to represent the
trademarked soup base products owned by Quoc Viet.  We understand that Quoc Viet
uses the term 'Cốt' as a trademark for their soup base products and as a way to
distinguish their soup base products from other Vietnamese soup base products.").)
Rushbrook's testimony is not persuasive because he testified that before he was asked by
Quoc Viet to sign the pre-prepared declaration in December 2013, he was not even aware
that Quoc Viet had trademarks in the "Cốt" phrases.  (Dkt. 347-8 at 48:4–25.)

Quoc Viet notes that at the prior trial, Tony Doan, owner of a restaurant, testified
that he recognized that "Cốt" was a trademark of Quoc Viet and that when he sees "Cốt,"

he knows it is a Quoc Viet product.  (Dkt. 348-12 at 53:22–55:2.)  At his December 8, 2014 deposition, however, Doan also admitted that he came to this understanding only because Quoc Viet's president informed him as such.  (Dkt. 347-5 at 37:16–38:15.) Quoc Viet also relies on the prior testimony of Kim Do of Longdan Ltd. who stated that she is "familiar" with Quoc Viet's products and thought they were "very good."  (Dkt. 348 at 32 (citing Dkt. 348-14 at 17:21–18:18.)  This testimony fails to speak to Kim Do's association of "Cốt" with Quoc Viet in particular.  In any event, Kim Do only became aware of Quoc Viet's "Cốt" trademarks when Tuan Nguyen informed her of them.  (Dkt. 347-5 at 27:21–28:6.)

Quoc Viet also cites the prior testimony of Justin Vuong, owner of the distributor Everything Foods, who previously testified that he associates "Cốt" with Quoc Viet. (Dkt. 347-11 at 10:5–8.)  However, in August 2013 Tuan Nguyen specifically informed Vuong that he could only use Quoc Viet's "Cốt" trademark phrases if he acknowledged said trademarks in writing.  (Trial Ex. 811.)  And at his deposition, Vuong could only identify partial English descriptions of some of Quoc Viet's soup base products, and not the Vietnamese names consisting of the "Cốt" trademarks.  (Dkt. 347-5 at 32:5–33:6.) Thus, the prior trial demonstrated that most of these witnesses became aware of Quoc Viet's trademarks only after Quoc Viet made a point of *telling* them that it owned the "Cốt" trademarks.[11]

Quoc Viet also cites the prior testimony of two consumers who confused Quoc Viet soup base products with those of VV Foods.  At the prior trial Huong Lan Phan testified that she attempted to purchase Quoc Viet's Cốt Bún Bò Huế product but accidentally purchased VV Foods' product instead.  (Dkt. 348 at 33 (citing Dkt. 348-15 at

---

[11] Although Quoc Viet does not cite the declaration of My Nga Vo of Cuisine Du Vietnam (another Quoc Viet customer), VV Foods points out that she also became aware of Quoc Viet's trademarks because she was specifically told as such.  (Dkt. 347-28 (citing Dkt. 347-5 at 40:9–21 and Trial Ex. 747).)

27-29:13).)  The other consumer, Phuoc Nguyen, testified at the prior trial that he went to the supermarket to buy Quoc Viet's Cốt Phở Bò and was confused because there was another product called Cốt Phở Bò and he did not know which to choose.  (*Id.* (citing Dkt. 348-16 at 86:21–87:24).)  Contrary to Quoc Viet's assertion, the testimony of two individuals hardly establishes that its marks had acquired secondary meaning among the general public—especially since each of these two consumers testified about just one Underlying Cốt Mark that has since been cancelled, and did not comment on their understanding of the word "Cốt" generally.

The testimony of these two consumers is further undermined by evidence that VV Foods' existing and prospective customers refer to one or more of the Additional Cốt Marks in a purely descriptive manner and therefore do not associate them with Quoc Viet.  For example, as early as September 2, 2004, Nga Vu received an email from a prospective customer, Linda Calvin, stating "But the thing is that I only want 2 oders [sic] of the COT PHO CHAY because i'm [sic] a vegetarian."  (Trial Ex. 817.)  On April 25, 2009, VV Foods received emails from another customer, Hoanghoa Nguyen, in Vietnamese, asking about different types of "cot" products because she was unable to find any on Amazon.com.  (Trial Ex. 815 at 1.)  On November 1, 2012, another customer named Kim emailed VV foods to order soup base products, specifically asking for "Cot Bo Kho," and other "Cot" products.  (*Id.* at 2.)  Finally, on April 7, 2013, VV Foods received an email from Tie Vuo in Vietnamese, inquiring about different kinds of "Cot" products including Cot Pho Bo, Bun Bo Hue, and Canh Chua Thai.  (Trial Ex. 818.)  That two consumers confused a Quoc Viet product with a VV Foods product is hardly evidence that the general public associates "Cốt" with Quoc Viet.  Simply put, Quoc Viet's evidence is not enough to outweigh the consumer survey results, supermarket practices, and VV Foods customer communications which all demonstrate that the "Cốt" marks had not acquired secondary meaning.

### 3.  Continuous, Substantially Exclusive Use

Quoc Viet argues that its "continuous and substantially exclusive use" demonstrates secondary meaning.  (Dkt. 348 at 25–26.)  Under Section 2(f) of the Lanham Act, "[p]roof of substantially exclusive and continuous use as a mark by [an] applicant in commerce for the five years next preceding the date on which the claim of distinctiveness is made is a *possible* basis for proof of acquired distinctiveness.  The Patent and Trademark Office (PTO) 'may' accept this as prima facie evidence of secondary meaning.  *This presumption is not mandatory*, and neither the Trademark Office nor the courts must accept the presumption in every case."  2 McCarthy § 15:62 (emphasis added).  Quoc Viet relies mainly on the conclusory testimony of its own president, Tuan Nguyen.  (Dkt. 348 at 27–28 (citing Dkt. 348-6 at 60:14–65:11, 71:14–72:3).)  Quoc Viet argues that it was the creator and first user of "Cốt" marks, and used the marks as early as January 2002.  (*Id.*)  It claims in a cursory fashion that "after approximately 15 years in the market and spending a lot of money and time to market the 'COT' mark, customers are aware or acknowledge that the COT brand and associate such with [Quoc Viet], which has led the company to extend its COT brand of products to non-soup base products like smoothie mixes."  (*Id.* at 27.)  Quoc Viet also states that "[t]here are no other companies in the entire soup base industry that uses [sic] the remaining COT marks at issue."[12]  (*Id.* at 28.)

As an initial matter, Quoc Viet's use has not been substantially exclusive.  Since 2002, VV Foods had also been making substantial use of the "Cốt" term for its soup base products, resulting in millions of dollars' worth of sales.  (*See* Dkt. 282-1 at 3.)  The Court previously found that Quoc Viet began using the "Cốt" term in January of 2002,

---

[12] When Nga Vu visited Vietnam she discovered dozens condensed food products sold at grocery stores that were labelled "Cốt."  (Dkt. 347-2 at 77:25–78:14; Trial Exs. 539, 540, and 541.)  While it is unclear which products are soup bases, as opposed to other condensed foods, they are all used in the context of condensed food.

and VV Foods began doing the same in "mid-2002." (Dkt. 284 at 15.) Since 2002, the parties have—in parallel—used the "Cốt" term on soup base products.[13] (*Id.* at 2.) Thus, it is simply inaccurate for Quoc Viet to assert that its use of the "Cốt" term has been substantially exclusive.[14]

Admittedly, Quoc Viet's use of its "Cốt" marks has been *extensive*. Evidence of extensive use alone, however, is generally insufficient to establish secondary meaning. *Art Attacks Ink, LLC. v. MGA Entm't, Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) ("Other circuits have explicitly held that extensive use alone cannot establish secondary meaning. . . . Our own cases have suggested that secondary meaning requires more than extensive use alone."); *In re Packaging Specialists, Inc.*, 221 U.S.P.Q. 917, 920 (T.T.A.B. 1984) ("Finally, sixteen years of use on applicant's part of the mark in question is a substantial period but not necessarily conclusive or persuasive on the Section 2(f) showing. Indeed, in several cases involving usage of comparable or even longer duration, some of these coupled with significant sales and advertising volume plus greater numbers of purchaser or customer attestations as to distinctiveness (solicited or otherwise) than we have here, the Board or its reviewing courts have found a failure to demonstrate acquired distinctiveness within the meaning of Section 2(f)."). Secondary meaning requires a showing that, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores*, 529 U.S. at 211. The majority of evidence in this case, namely supermarket practices, consumer

---

[13] Although VV Foods conceded that it was unaware of any party besides Quoc Viet that specifically used the exact configuration of words in the nine Additional Cốt Marks, (Dkt. 347 at 29), Quoc Viet's entire argument centered on the use of "Cốt," and neither side focused on the significance of the words following "Cốt" in each of the marks (that described particular flavors).

[14] Quoc Viet's claimed exclusive use is even less persuasive in light of evidence that Quoc Viet "mandates that its private label customers not use the Cốt terms on their soup base products as a condition to do business with Quoc Viet, and has over the years sued or threatened to sue other manufacturers who use the term Cốt in any capacity in connection with their soup-related products, including counterclaimant [VV Foods] and West Lake Food Corporation." (Dkt. 347 at 30 (quoting Trial Ex. 157).)

survey results, and customer perceptions, demonstrates that the public primarily associates "Cốt" with concentrated food products, and not with Quoc Viet in particular. That Quoc Viet has made extensive use of the "Cốt" term does not prove otherwise.

### 4. Advertising

Secondary meaning can also be established through advertising, 2 McCarthy § 15:50, and "[e]vidence of the amount of money spent in promotion and advertising of the mark in issue is relevant to the issue of secondary meaning," *id.* § 15:51. However, extensive advertising *alone* does not create secondary meaning. *Id.*; *see also First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) (holding that "a large expenditure of money does not in itself create legally protectable rights" and that "[t]he test of secondary meaning is the effectiveness of the effort to create it"). As a result, the "nature, content and exposure of publicity and advertising is needed to determine how compelling is the logical inference that this advertising created a secondary meaning," since advertising expenditures are merely "a part of the total picture" of secondary meaning. 2 McCarthy § 15:52. Put differently, the advertising must not simply aim to promote the *goods* at issue; instead it should promote the *connection* between the mark and the source of the goods. *Parks and Recreation*, 448 F.3d 1118, 1128 (9th Cir. 2006) (holding that the advertising must be "of a nature and extent such as to *create an association of the term with the user's goods*") (emphasis added). For that reason, courts reject even evidence of significant amounts of advertising is that advertising if not aimed at promoting some connection between a mark and a source of goods. *See*, *e.g.*, *First Brands*, 809 F.2d at 1383 (in a trade dress case, affirming the district court's rejection of evidence of "millions of dollars in advertising" because the advertising campaign had not "stressed the color and shape" of the product at issue—an antifreeze jug—by, "for example, urging consumers to look for the 'familiar yellow jug'"); *Parks and Recreation*, 448 F.3d at 1128 (finding that a descriptive mark

had failed to acquire secondary meaning because there was "no evidence of any . . .

advertising or promotional efforts . . . *designed to associate the marks with the*

*[plaintiff's] services*") (emphasis added).


Quoc Viet argues that it is "so protective of its marks" that it has spent an average

of between $100,000 to $250,000 annually to promote the "Cốt" brand.  (Dkt. 348 at 29

(citing Dkt. 348-6 at 82:4–16).)  VV Foods counters that Quoc Viet's advertising expense

report from 2002 until 2016 shows that its average annual advertising expenditures is

actually $83,685.60—the per-year expenses varied from as little as $17,016.40 in 2007 to

as high as $126,337.04 in 2013.  (Dkt. 347 at 18 (citing Trial Ex. 226; Dkt. 347-5 at

14:18–18:15).)  Quoc Viet's high estimates include the costs of samples, demonstration

expenses, travel, and commission in addition to advertising.  (*See* Trial Ex. 226.)  VV

Foods also argues it is not possible to divine how much advertising is spent on each

trademark because Quoc Viet's advertising expenditures are not itemized.  (Dkt. 347 at

18 (citing Trial Ex. 226; Dkt. 347-5 at 17:6–18:15).)  Quoc Viet insists, however, that

these expenditures are made "to specifically market and promote [Quoc Viet's "Cốt"]

brand of products as opposed to [Quoc Viet's] name or other products they sell," and that

its activities were "nationwide and varied including advertisement on radio, onsite

demos, and local newspaper [sic]."  (Dkt. 350 at 20 (citing Dkt. 341-4 at 82:4–83:4,

83:13–84:13.)


Regardless, the record is absent of evidence of advertising directed towards a

*connection* between the mark and the source of the goods beyond Tuan Nguyen's own

conclusory testimony.  For example, the majority of Quoc Viet's advertising does contain

the term "Cốt," but does not call any particular attention to that term—it just displays an

image of one or more of its products which happen to have the word "Cốt" somewhere on

the label, or uses "Cốt" as part of a lengthy product description.  (*See* Trial Ex. 38 at 2–

9.)  These advertisements make a point of prominently displaying phrases like "Made in

USA," "Simple and Authentic!" and "No Preservatives No Artificial Flavor & Color No MSG Added" through the use of large text and banners, but never use the same types of efforts to call particular attention to the term "Cốt." (*See id.*)  Some of Quoc Viet's advertising is in English and does not contain the term "Cốt" at all. (*See id.* at 1.)  None of the evidence concerning Quoc Viet's advertising even approaches the sort of focused advertising that might create the requisite association in consumers' minds.  It does not demonstrate secondary meaning.

### 5.  Sales

Quoc Viet also argues that its high sales demonstrate secondary meaning, since its estimated total sales of "Cốt" brand products from 2002 until present amount to approximately $100–130 million.  (Dkt. 348 at 30–31.)  VV Foods argues this is contradicted by Quoc Viet's own sales reports, and that Quoc Viet's estimates are over-inclusive because they do not focus on the relevant time period (they should start from the date of registration) and are not limited to the five marks on the Principal Register.  (Dkt. 349 at 9.)  VV Foods also argues that Quoc Viet's estimate is inaccurate because it does not deduct sales of products it privately labels to various soup base distributers under another brand name, and does not deduct its bulk size sales of the Additional Cốt Marks.  (*Id.*)  Using Quoc Viet's sales figures, VV Foods contends that the appropriate calculation of sales is closer to $6 million.  (*Id.* at 9–10.)

Regardless of the appropriate amount, there is simply no evidence indicating that the use of the "Cốt" term is what is *driving* sales of Quoc Viet's products, as opposed to their novelty or utility.  Professor McCarthy explains, "[p]opularity of a product is not synonymous with secondary meaning.  Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark.  To make popularity relevant as evidence, causation between the trademark and the popularity must

be proved." 2 McCarthy § 15:43.  As Tuan Nguyen testified, the majority of his customers are of Vietnamese and Asian descent, which is why the labels and instructions are in Vietnamese and in English.  (Dkt. 347-4 at 118:16–119:2, 120:15–22.)  The more logical inference based on the evidence presented at trial is that Vietnamese and Asian customers rely on the "Cốt" Marks to help them identify the particular flavor and product they want to buy—not because of a particular association with Quoc Viet.

For these reasons, the Court concludes that the Additional Cốt Marks did not acquire secondary meaning at the time of registration or at any time thereafter. Accordingly, the nine Additional Cốt Marks are hereby DECLARED INVALID and CANCELLED. [15]

**D.  Unclean Hands**

Quoc Viet argues that VV Foods' claims are barred by the doctrine of unclean hands.  (Dkt. 348 at 33.)  To make out an unclean hands defense, a trademark defendant "must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."  *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002).  In one conclusory paragraph Quoc Viet argues that "testimony showed that [VV Foods] had a prior relationship with [Quoc Viet], that they sold product [sic] under identical names for [Quoc Viet], and then they started selling similar/identical products under similar/identical names with the intent to deceive consumers into believing that they are purchasing [Quoc Viet's] products.  Because [VV Foods'] use of the marks to deceive customers was and is inequitable and relates to the subject matter of its claims, its requested relief should be denied."  (Dkt. 348 at 33.)

---

[15] VV Foods also argues that Quoc Viet's marks are not eligible for registration on the Supplemental Register because they are not capable of distinguishing their source.  (Dkt. 347 at 35–38 (citing 15 U.S.C. 1091(c).)  The Court need not consider this argument because it finds that all nine Additional Cốt Marks are descriptive and have not acquired secondary meaning.

Quoc Viet does not cite a single piece of evidence to demonstrate VV Foods' intent to deceive.  Moreover, as Professor McCarthy notes, "there is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain.  For example, evidence that a junior user exactly copied unprotected descriptive, generic, or functional public domain words or shapes does not prove any legal or moral wrong(s)."  4 McCarthy § 23:122.  The Court has already ruled that VV Foods was *not* liable for infringement as to the Underlying Cốt Marks that Quoc Viet claims VV Foods copied.  As previously explained, "Tuan Nguyen was the first to devise and produce a pho soup base.  His initial success makes it entirely unsurprising that a competitor, VV Foods, chose to immediately follow suit, produce a similar product, and call it a similar (descriptive) name.  What drove that copying was surely that people were *buying Quoc Viet's soup base*, not that people had so closely associated the "Cốt" marks with Quoc Viet in a matter of months that VV Foods could capitalize off that association and copy Quoc Viet's still-barely-known products."  (Dkt. 284 at 19–20.)  VV Foods did not act with unclean hands.

## IV.  CONCLUSION

For the foregoing reasons, judgment is entered in favor of VV Foods.  All nine Additional Cốt Marks (Cốt Hủ Tiếu, Cốt Canh Chua, Cốt Bún Riêu, Cốt Súp Bò, Cốt Súp Hoành Thánh, Cốt Súp Cà Ri, Cốt Phở Chay, Cốt Sinh Tố, and Cốt Bò Kho) are DECLARED INVALID and CANCELLED.

DATED:     February 17, 2017

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE